RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARC VALENTINO BARRERA,

　　　　　　　*Plaintiff-Appellant*,

　　*v.*

CITY OF MOUNT PLEASANT, MICHIGAN; ISABELLA
COUNTY, MICHIGAN; CAREY MURCH; JEFF THOMPSON;
JACOB EGGERS; CHRISTOPHER CLULEY,

　　　　　　　*Defendants-Appellees*.

> No. 20-1863

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:19-cv-11807—Thomas L. Ludington, District Judge.

Argued:  July 29, 2021

Decided and Filed:  September 3, 2021

Before:  SUTTON, Chief Judge; SUHRHEINRICH and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Kierston D. Nunn, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Marcelyn A. Stepanski, ROSATI, SCHULTZ, JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees City of Mount Pleasant, Carey Murch, and Jeff Thompson.  Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees Isabella County, Jacob Eggers, and Christopher Cluley.  **ON BRIEF:**  Kierston D. Nunn, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Marcelyn A. Stepanski, ROSATI, SCHULTZ, JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees City of Mount Pleasant, Carey Murch, and Jeff Thompson.  Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees Isabella County, Jacob Eggers, and Christopher Cluley.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  At stake in this § 1983 lawsuit is whether Marc Barrera's refusal to provide his name during an investigatory stop gave law enforcement officers probable cause to arrest him under Michigan law.  The district court rejected the claim.  We affirm.

I.

While patrolling a known drug house in the early hours of a fall night, Sergeant Carey Murch spotted a black Buick.  Affiliated with the Mount Pleasant Police Department in Michigan, Murch recognized the Buick as a car he had stopped twice before, each time culminating in a drug-related arrest.  When Officer Murch ran the plates this time, he discovered that the vehicle's owner, a Robert Shehan, lacked a current driver's license.

From his observation spot, Officer Murch saw the Buick pull away from the drug house and start speeding.  Officer Murch stopped the car based on two suspected infractions (speeding and driving without a license) and called for backup.  Officer Jeff Thompson soon arrived.

The driver identified himself as Joaquin Garcia and admitted that he lacked a driver's license.  Because permitting someone without a license to drive a car violates Michigan law, Mich. Comp. Laws § 257.904(2), the officers sought to discover whether Shehan, whom they had never met, was among the vehicle's three remaining passengers.

Two passengers gave names other than Shehan.  The third refused to identify himself after repeated requests.  A patdown of this last man did not reveal a driver's license or name, but it did uncover eleven empty plastic bags and $1033 in cash.  When the unnamed man still would not identify himself, officers took him to the Isabella County Jail for fingerprinting.

But it was not fingerprinting that revealed his name.  It was a tattoo, in truth two tattoos.  Consistent with standard practice, the jail officials had the man remove his sweater.  The removal of the arms-length sweater answered the question the officers had been asking.  One arm bore the name "Marc," the other "Barrera."  After running the name through a database, officers

confirmed that they had detained Marc Barrera, a parole violator with several outstanding arrest warrants. That led to a strip search of Barrera, which revealed marijuana and cocaine.

A Michigan grand jury indicted Barrera on five drug offenses. Barrera moved to suppress the drugs, arguing that the officers violated the Fourth Amendment by taking him to jail without probable cause for an arrest. The Michigan trial court denied the suppression motion. A jury convicted Barrera on two counts.

The Michigan Court of Appeals reversed. It overturned his conviction after concluding that the officers arrested him without probable cause.

After leaving state prison, Barrera entered federal district court. He sued the officers and city under § 1983 and state law.

In granting summary judgment to the defendants with respect to their qualified immunity defense, the district court ruled that the officers had probable cause to take Barrera to jail because his refusal to identify himself under these circumstances violated Michigan law.

II.

*Section 1983 claims against Officers Murch and Thompson.* As in all qualified immunity cases, this false-arrest claim prompts two questions. Did the officers violate Barrera's constitutional rights? If so, were those rights clearly established at the time? *See Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The guarantee, all agree, requires probable cause for an arrest. And the officers, all agree, arrested Barrera when they took him to jail for fingerprinting.

An officer has probable cause to arrest a suspect when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). An objective, not a subjective, standard applies. The question is whether the observable

circumstances justify an arrest; the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Through it all, this "fluid concept" looks for a "probability" that the suspect violated a criminal statute, *Illinois v. Gates*, 462 U.S. 213, 232, 244 n.13 (1983), keeping in mind that probable cause does not establish "a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014).

In a typical probable cause dispute, the parties agree that state law criminalizes certain conduct but dispute whether the facts permit the inference that the defendant engaged in that conduct. The parties might, for example, agree that Michigan makes it unlawful to possess drugs but disagree over whether an officer who has discovered a scale and empty plastic baggies on a person may infer that the person possessed drugs.

But this dispute is not a prototype. The officers directly observed Barrera's refusal to identify himself when ordered to do so. No one doubts what he did. What the parties debate is whether the relevant state law, a Michigan statute, criminalizes this conduct.

That reality introduces an analytical complication, one that requires a brief digression. What part of the qualified immunity inquiry does a dispute over the meaning of a state law implicate? The first question: Did the officers violate the citizen's constitutional right? Or the second one: Did the officers violate a clearly established right? Both are in play, it seems to us, and either one permits a federal court to resolve a qualified-immunity defense without deciding exactly what the state law means.

One possibility is that a constitutional violation never arises in the first place because, even if the officers misread state law, the mistake was a reasonable one. Just as a reasonable mistake of fact does not violate an individual's Fourth Amendment rights, so a reasonable mistake of law does not violate them either.

*Heien v. North Carolina* illustrates the point. 574 U.S. 54, 66 (2014). Officers mistook whether North Carolina law required one brake light or both of them to be in working order. Even so, the Court held that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition." *Id.* at 60. "To be reasonable is not to be perfect," the Court

explained, "and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). A law may prohibit "vehicles" in the park and the state courts eventually will finally resolve whether it "covers Segways or not," but until then the Fourth Amendment tolerates reasonable mistakes with respect to an officer's "quick decision" about the scope of the law. *Id.* at 66. In this setting, when an officer reasonably misinterprets the meaning of state law, there is "no violation of the Fourth Amendment in the first place." *Id.* Favorable case law goes a long way to showing that an interpretation is reasonable. *United States v. Diaz*, 854 F.3d 197, 204–05 (2d Cir. 2017); *cf. Heien*, 574 U.S. at 70 (Kagan, J., concurring) (suggesting that an officer's mistake of statutory interpretation is reasonable when a "reasonable judge could agree with the officer's view").

The other possibility is that the ambiguity in state law shows that the officers did not violate a clearly established right—the second prong of the qualified immunity test. While this inquiry is similar to the reasonable mistake-of-law test, it is not the same. The reasonable mistake-of-law "inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." *Heien*, 574 U.S. at 67. The more forgiving question asks only whether, at the time of the officer's conduct, the law was "sufficiently clear that every reasonable official would [understand] that what he is doing" violates the law—so clear that the invalidity of the officer's actions was "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation omitted). This rigorous standard covers "all but the plainly incompetent" officer. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

*Wesby* illustrates this point. *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). At issue in this § 1983 action was whether the police violated a score of partygoers' Fourth Amendment rights when they arrested them for disorderly conduct and unlawful entry into a vacant house under D.C. law. One question in the case was whether local D.C. law prohibited the arrest because the partygoers claimed to have been invited to the house. Given the absence of settled local law and Fourth Amendment law in this setting, the Court reasoned that, even if "the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to

qualified immunity because they reasonably but mistakenly concluded that probable cause was present." *Id.* at 591 (quotation and alterations omitted).

Under either approach, we need not decide exactly what the statute means if the officers reasonably interpreted it. U.S. Const. amend. IV; *Heien*, 574 U.S. at 60; *United States v. Vance*, 893 F.3d 763, 770 (10th Cir. 2018) (explaining that under *Heien*, courts "need not resolve the state law question, only whether the officer's interpretation was reasonable").

Let us start, and largely end, with the *Heien* reasonable mistake-of-law inquiry. The statute makes it a felony to "obstruct[]" a police officer who is "performing his or her duties." Mich. Comp. Laws § 750.81d(1), (7)(i); *see also id.* § 750.479. The law contains three elements: "(1) the defendant . . . obstructed . . . a police officer, . . . (2) the defendant knew or had reason to know that the person that the defendant . . . obstructed . . . was a police officer performing his or her duties," and (3) the "officer[] acted lawfully." *People v. Quinn*, 853 N.W.2d 383, 388 (Mich. Ct. App. 2014) (quotation omitted). "Obstruct," the statute says, "includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a).

That leaves this question: Was it "objectively reasonable for an officer in [Murch and Thompson's] position to think that [Barrera's refusal to identify himself] was a violation of [Michigan] law"? *Heien*, 574 U.S. at 68.

The first two elements generate little drama. Officers Murch and Thompson both repeatedly told Barrera to identify himself. Even knowing that they were police officers, Barerra refused. In these respects, Barrera knowingly failed to comply with the police officers' command, or at least gave the officers reason to believe he had. *See United States v. Mosley*, 575 F.3d 603, 607 (6th Cir. 2009) (noting that the statute encompasses "refusing to produce information"). Barrera does not argue otherwise.

Today's dispute centers on the third element: Was the command that Barrera identify himself "lawful"?

*Hiibel v. Sixth Judicial District Court of Nevada* takes us part of the way to the answer. 542 U.S. 177 (2004). A Nevada officer received a report of a man assaulting a woman in a truck. *Id.* at 180. When the officer located the truck, he asked the man to identify himself. *Id.* at 180–81. The driver refused the officer's repeated requests. *Id.* at 181. Based on this refusal, the State convicted him under its obstruction statute. *Id.* at 181–82. The U.S. Supreme Court affirmed the conviction over his Fourth and Fifth Amendment challenges to the arrest and conviction. *Id.* at 189–91.

*Hiibel* confirms that an officer may detain a person to investigate a crime when the officer has "reasonable suspicion" that the person "may be involved in criminal activity." *Id.* at 185; *see Terry v. Ohio*, 392 U.S. 1 (1968). It confirms that, during a *Terry* stop, an officer may request that the detained person identify himself, so long as the request amounts to one "reasonably related in scope to the circumstances which justified the stop." *Hiibel*, 542 U.S. at 189 (quotation omitted). It confirms that a *Terry* stop suspect does not have a Fourth Amendment right to refuse the request. *Id.* at 187. And it confirms that a State may criminalize the failure to comply. *Id.* at 187–88.

In today's case, the officers reasonably could believe that their command that Barrera identify himself complied with these principles. Start with the reasonablenesss of the *Terry* stop. Recall that the officers pulled over a speeding car driven by someone other than the owner and by someone who lacked a driver's license. They reasonably suspected that the owner, Robert Shehan, had unlawfully turned his keys over to an unlicensed person and that Shehan was among the three passengers. They ruled out two of the passengers, creating a fair probability that Barrera was Shehan and reasonably prompting them to ask Barrera his name. All told, the officers conducted a valid stop, and the identification order was "reasonably related in scope to the circumstances which justified the stop."

*People v. Quinn* takes us the rest of the way. 853 N.W.2d 383 (Mich. Ct. App. 2014). A jury convicted the defendant of obstruction after he disobeyed an officer's commands to identify himself and to step out of his apartment. *Id.* at 385, 389. In addressing the lawfulness of those commands, the Michigan Court of Appeals declined to direct a verdict in the defendant's favor. *Id.* at 389. It reasoned that, because the officer had reasonable suspicion of criminal

activity under the Fourth Amendment, a jury could find beyond a reasonable doubt that the officer's "repeated requests to defendant and [his friend] to produce their identification, and her request to defendant to exit the apartment, were lawful." *Id.* What counted as a crime beyond reasonable doubt in *Quinn* suffices to show a reasonable encounter here.

Had the officers been given the luxury to put a pause on this encounter and to do some additional legal research, they would have seen that other courts have reached similar conclusions since *Hiibel*. The Connecticut Supreme Court upheld a defendant's conviction for "obstruct[ing], resist[ing], hind[ering] or endanger[ing]," Conn. Gen. Stat. § 53a-167a, based on the defendant's refusal to provide identification during a valid *Terry* stop. *State v. Aloi*, 911 A.2d 1086, 1092–93, 1096 (Conn. 2007). The Eleventh Circuit likewise concluded that investigating a person's identity during a *Terry* stop falls within an officer's "lawful discharge of his or her official duties" under the Georgia obstuction statute, Ga. Code Ann. § 16-10-24, so long as reasonable suspicion supports the stop. *Williams v. Hudson*, 602 F. App'x 769, 773 (11th Cir. 2015) (per curiam) (citing *Hiibel*, 542 U.S. at 188). All in all, the officers reasonably could believe that Michigan's obstruction statute encompassed Barrera's refusal to identify himself and that this interpretation of state law did not violate the Fourth Amendment.

Barrera pushes back on this conclusion. He first argues that the officers lacked reasonable suspicion to stop him, removing the encounter from *Terry*'s safe harbor. But he never explains why as a matter of law or fact. As a matter of law, he does not cite any cases rejecting reasonable suspicion under similar circumstances. As a matter of fact, he does not explain why the speeding car, the lack of a driver's license for the owner of the car, or the unusual nature of the stop—including the missing owner of the car—did not create reasonable suspicion to stop the vehicle and detain its passengers.

Barrera next argues that a State may not penalize someone for failing to identify himself during a *Terry* stop, invoking dicta from a 1984 U.S. Supreme Court decision and a concurrence from the 1968 *Terry* decision. The dicta: "[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). The concurrence: "Of course, the person stopped is not

obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." *Terry*, 392 U.S. at 34 (White, J., concurring). To the extent these observations once created uncertainty about the rules surrounding this aspect of a *Terry* stop, *Hiibel* eliminated it. *Hiibel* acknowledged both statements, determined they did not control, and concluded that a State may penalize a refusal to identify oneself during a *Terry* stop. "[W]e cannot view the dicta in *Berkemer* or Justice White's concurrence in *Terry*," the Court explained, "as answering the question whether a State can compel a suspect to disclose his name during a *Terry* stop." *Hiibel*, 542 U.S. at 187.

Equally relenting is Barrera's next argument—that the officers allegedly did not subjectively believe they had probable cause when they took him to jail for fingerprinting. But plenty of cases "make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153; *see Heien*, 574 U.S. at 66; *Whren v. United States*, 517 U.S. 806, 810–13 (1996).

Barrera adds that a different Michigan statute places limitations on this kind of investigation. The law says that "a person who is informed by a peace officer that he or she is conducting a criminal investigation" may not "knowingly and willfully conceal from the peace officer any material fact relating to the criminal investigation." Mich. Comp. Laws § 750.479c(1)(a). "This section," the law adds, "does not prohibit a person from" "[i]nvoking the person's rights under the Fifth Amendment" or "[d]eclining to speak to or otherwise communicate with a peace officer concerning the criminal investigation." *Id.* § 750.479c(4)(a)-(b). To Barrera's mind, the addendum makes the officers' identification orders in this case illegal under Michigan law and by extension the Fourth Amendment.

But the officers could reasonably read this statute to mean something else. The provision explains only what "[t]his section"—Mich. Comp. Laws § 750.479c—"does not prohibit." It does not say what other sections—including § 750.81d, invoked here and located in a different chapter of Michigan's criminal code—prohibit. In addressing the investigatory rules for witnesses of crimes, this law does not clearly speak to questioning in connection with a valid *Terry* stop and reasonable questioning directed to a valid suspect during the stop. It is one thing to set out state-law rules for questions directed to individuals under no suspicion of committing a

crime; it is quite another to direct an identification question to someone reasonably suspected of a crime.

No less importantly, we need not resolve each mete and bound of Michigan's obstruction statute or its interaction with other statutes. We need only decide whether the officers' interpretation sinks to unreasonable. *Heien*, 574 U.S. at 60. That point becomes more salient when one accounts for the reality that neither Barrera nor we have been able to identify any cases reading this statute the way he does. Several cases indeed break the other way, showing (in Barrera's words) that "if a police officer asks for a citizen's identity and the citizen refuses then the citizen has failed 'to comply with a lawful command' and can be arrested for resisting and obstruction." Appellant Br. at 31; *see, e.g.*, *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 630 (E.D. Mich. 2016); *Combs v. City of Birmingham*, No. 12-14528, 2013 WL 4670699 (E.D. Mich. Aug. 30, 2013); *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297 (E.D. Mich. Feb. 13, 2006).

But even if the officers unreasonably misread state law, Barrera still would come up short. He has not shown that they violated clearly established law that would pierce the officers' qualified immunity shield. He has not cited, and we have not found, "a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation 'under similar circumstances.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (quotation omitted). As the district court aptly put the point, "[i]t would be extraordinary to expect law enforcement officers in the field to make determinations in a matter of minutes that judicial officers themselves cannot come to a consensus on after hours of measured consideration of the law and facts." R.49 at 19; *see Mocek v. City of Albuquerque*, 813 F.3d 912, 927 (10th Cir. 2015) (granting qualified immunity in a similar case where it was unclear under New Mexico law what form of identification an officer could request); *Henes v. Morrissey*, 533 N.W.2d 802, 809–10 (Wis. 1995) (granting qualified immunity in a similar case even though Wisconsin's obstruction statute by its terms criminalized only "knowingly giving false information" or "knowingly placing physical evidence with intent to mislead").

That leaves one wrinkle—*People v. Morris*, 886 N.W.2d 910 (Mich. Ct. App. 2016), a case that arose under the First Amendment, not the Fourth Amendment. In upholding Michigan's obstruction statute against a free-speech challenge under the First Amendment, it

dropped a footnote suggesting that a "'knowing failure to comply with a lawful command' requires some physical refusal to comply with a command, as opposed to a mere verbal statement of disagreement." *Id.* at 916 n.6. Barrera might have argued that *Morris* shows that his refusal to identify himself did not amount to "obstruction" under the statute. But he did not raise the point below or here, perhaps because it is a free-speech case, and he thus has forfeited the point. *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014).

Even on its own terms, however, *Morris* does not alter our conclusion. While this free-speech decision offers support for Barrera, it remains a First Amendment decision, and it does not overrule a pertinent Fourth Amendment decision from the same intermediate court. *Quinn*, 853 N.W.2d at 390. No less true, *Morris* does not come to grips with the text of this part of the statute, which says nothing about a "physical refusal" requirement, and it does not provide a basis for saying that the officers could not reasonably rely on *Quinn* and the many federal precedents that construe the language of the Michigan law to permit this arrest. *See Mosley*, 575 F.3d at 607; *Amis v. Twardesky*, 637 F. App'x 859, 862 (6th Cir. 2015); *United States v. Wilson*, 501 F. App'x 499, 501 (6th Cir. 2012); *United States v. Blomquist*, 356 F. App'x 822, 826 (6th Cir. 2009); *Chesney*, 171 F. Supp. 3d at 628–30, 628 n.27; *Combs*, 2013 WL 4670699, at *7–10; *Devoe*, 2006 WL 334297, at *4. Even with *Morris* on the books, these other decisions undercut the idea that the officers made an unreasonable mistake or violated clearly established law during this encounter. *Morris* did not, in short, "find[] a Fourth Amendment violation 'under similar circumstances'" to the ones here, *Wesby*, 138 S. Ct. at 591 (quotation omitted), let alone put the issue "beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Stockdale v. Helper*, 979 F.3d 498, 506–07 (6th Cir. 2020).

*Other claims*. Barrera brought several other claims: state law claims against Officers Murch and Thompson, state and federal claims against two officers who worked at the jail, and state and federal claims against two local governments. Each claim founders on the ground that his arrest complied with the Fourth Amendment or at a minimum that the officers did not violate clearly established law in arresting him. Barrera does not argue otherwise.

We affirm.