NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0005n.06

Case No. 21-1527

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| COREY BAUMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| SCOTT MILLISOR, THOMAS ZAHINA, | ) | |
| DAVID BERTI, and MICHAEL TAVTIGIAN, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

**FILED**
Jan 04, 2022
DEBORAH S. HUNT, Clerk

Before: GILMAN, KETHLEDGE, and LARSEN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** In November 2016, Corey Bauman flew to Tampa, Florida to pick up his children from his ex-wife and accompany them back to his home in Michigan. An incident occurred after their landing at the Detroit airport that culminated in Bauman being arrested for disorderly conduct. He later filed a lawsuit against the individual officers involved in his arrest, arguing that they lacked probable cause to arrest him and therefore violated his Fourth Amendment rights. The district court rejected his argument and granted summary judgment in favor of the officers. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Bauman is a police officer and divorced father of three who resides in Michigan. His three children are Kelsey, Cassidy, and Cody, who were 16, 12, and 11 years old, respectively, at the time of the incident. The children live in Florida with Bauman's ex-wife, but under the terms of his divorce agreement, the children would come stay with Bauman for the week of Thanksgiving every year.

On November 19, 2016, Bauman flew to Tampa, Florida to pick up his children and bring them back to Michigan. He consumed either one or two liquor beverages on the flight to Tampa. After landing in Tampa, he met his children at the airport's ticketing counter, then immediately returned to the gate for their return flight. He had two more liquor beverages on the flight back to Michigan.

Once back at the Detroit airport, Bauman accompanied his children to the baggage claim area to collect their luggage. The airport's video system captured nearly all of their movements as they proceeded through the airport. A fellow passenger on their flight, William Bertrand, noticed that Bauman was "stumbling and having difficulty maintaining his balance" and "appeared to be visibly drunk." According to Bertrand, Kelsey "was visibly frightened and scared," and she told Bertrand that she was afraid to go home with her father because he had been drinking alcohol. Bertrand relayed this information to Carla Chupac, an employee at the airport's information desk.

Chupac approached Kelsey—who, according to Chupac, was "crying and visibly frightened"—and told her to "tell your dad you're going to the bathroom," and then to come back to the information desk. Kelsey followed Chupac's advice. Once back at the desk, Kelsey told Chupac that her father was drunk and that she did not want to drive home with him. Chupac then contacted the Airport Police and asked that they "send someone down immediately" because "there

is a very drunk man trying to leave with three children." She then provided a description of Bauman. At the behest of the responding officers, the dispatcher asked Chupac: "what was he doing that makes you think he is intoxicated?" Chupac responded: "I had a customer come and tell me that he was . . . swaying back and forth. His oldest daughter, who is down here, is crying. She does not want to get in the car with him." The dispatcher then relayed that information to the responding officers.

Corporal David Berti was the first officer to encounter Bauman, who was leaning against a railing on the ticketing level of the airport when Berti approached him. Berti asked Bauman to have a seat on a bench about 100 feet away. According to Berti, Bauman "seemed unsteady when he was walking" and was staggering so much that Berti was concerned that Bauman would fall over. Berti also testified that Bauman's eyes were glassy and that Bauman struggled to retrieve his identification from his wallet when asked.

Investigator Scott Millisor also responded to the dispatch call. He first spoke briefly to Kelsey, who stated that Bauman was intoxicated when he picked the children up in Tampa and had continued to drink on the flight back to Detroit. Berti then asked Millisor to assist Berti in his discussion with Bauman. Millisor testified that he could smell alcohol on Bauman's breath or clothes and that Bauman was slurring his words and had difficulty retrieving his driver's license. When Millisor asked Bauman how much he had to drink, he replied: "a couple shots." Millisor also asked Bauman how he planned on getting home from the airport, and Bauman told him that Kelsey was going to drive because she had a learner's permit.

Sergeant Thomas Zahina was the third officer who responded to the dispatch call. He found Kelsey hiding and crying behind the information desk, and he spoke with her and Chupac to find out more about the situation. Shortly thereafter, Zahina went to join in Berti's and

Millisor's conversation with Bauman. He was informed that Bauman was not cooperating with their investigation and had refused a Preliminary Breath Test (PBT). Zahina concluded that Bauman was intoxicated based on his glassy eyes, the strong odor of alcohol emanating from his breath, his lack of coordination when trying to walk straight, and his inability to find his identification in his wallet.

After consulting with Millisor, Zahina decided that Bauman should be arrested for disorderly conduct because his alcoholic state rendered him unable to take care of himself or his children. Berti and Millisor then escorted Bauman out of the airport, where they handcuffed him, placed him in a police vehicle, and transported him to a nearby police station. Lieutenant Michael Tavtigian encountered Bauman for the first time during the booking process at the police station, where he could smell intoxicants on Bauman's person. Tavtigian asked Bauman to take a PBT several times, but Bauman refused, so Tavtigian made the decision to detain Bauman overnight. Bauman was released from custody at 9:15 A.M the next morning. After originally being charged with disorderly conduct, Bauman later pleaded guilty to the reduced charge of double parking.

Bauman filed this lawsuit in November 2019, seeking damages under 42 U.S.C. § 1983 against each of the four officers involved in his arrest and detention. Specifically, he alleges that the defendants violated his Fourth Amendment right to be free from unreasonable seizure because they lacked probable cause to arrest and detain him for disorderly conduct. The district court, however, found that the defendants did have probable cause for Bauman's arrest and therefore granted their motion for summary judgment. This timely appeal followed.

## II. ANALYSIS

**A.      Standard of review**

We review the district court's grant of summary judgment de novo. *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.      Qualified immunity**

The four officers invoked the defense of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). When such a defense is raised, the plaintiff bears the burden of showing that the defendants are not entitled to qualified immunity. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020). This court has generally "use[d] a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). We can consider these steps in either order, so "[i]f the court concludes that no constitutional violation has occurred, there is no need to address whether the alleged right was clearly established." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

**C.      Probable cause**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  In interpreting the Amendment, the Supreme Court has held that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The determination of probable cause in any given situation does not lend itself to a formulaic recitation, but this court has elaborated on the rules and considerations that guide our analysis:

> The inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," [*id.*] at 152, 125 S.Ct. 588, where supported by "reasonably trustworthy information." *Beck [v. Ohio*, 379 U.S. 89, 91 (1964)].  No overly-burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest. In initially formulating probable cause, they need not "investigate independently every claim of innocence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).  And after the officer determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence. *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988).  However, the initial probable cause determination must be founded on "both the inculpatory *and* exculpatory evidence" known to the arresting officer, *Gardenhire*, 205 F.3d at 318 (emphasis in original); *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999), and the officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Ahlers*, 188 F.3d at 372.

*Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007).  "Through it all, this fluid concept looks for a probability that the suspect violated a criminal statute, keeping in mind that probable cause does not establish a high bar." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (internal citations and quotation marks omitted).

Police officers, in their assessment of probable cause, need not rely solely on the information that they witness first-hand.  Instead, "[t]he collective-knowledge doctrine permits an officer to conduct a stop based on information obtained from fellow officers." *Bey v. Falk*, 946

F.3d 304, 316 (6th Cir. 2019) (citation and internal quotation marks omitted). The rationale behind the doctrine is that "police officers must often act swiftly and cannot be expected to cross-examine their fellow officers about the foundation of transmitted information, [so] we impute collective knowledge among multiple law enforcement agencies." *Id.* (alterations, citations, and internal quotation marks omitted). We thus look to the "collective knowledge of [officers] working as a team . . . in determining probable cause," so long as there is evidence that the officers communicated the relevant information among themselves. *United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (citation omitted).

Each defendant's actions must be analyzed separately to determine whether Bauman "has stated a plausible constitutional violation by each individual defendant." *See Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011). We therefore analyze the actions of Berti, Millisor, and Zahina—who were involved in the decision to arrest Bauman—separately from the actions of Tavtigian, who made the separate decision to detain Bauman overnight.

### 1. *Berti, Millisor, and Zahina*

Under Michigan's disorderly-conduct statute, Mich. Comp. Laws § 750.167(e), a person commits the misdemeanor of disorderly conduct if he or she "is intoxicated in a public place and . . . is either endangering directly the safety of another person or of property or is acting in a manner that causes a public disturbance." *See also People v. Gagnon*, 341 N.W.2d 867, 870 (Mich. Ct. App. 1983) (construing "the public disturbance provision of the disorderly person statute to require a finding that an accused, while intoxicated, directly endangered the safety of another person or of property").

We first look to the record to determine whether the officers had a reasonable basis to believe that Bauman was intoxicated in a public place. There is no dispute that the Detroit airport

is a public place, and there was sufficient evidence giving rise to the probability that Bauman was intoxicated. The dispatcher relayed that there was a report of an intoxicated male in the airport who matched Bauman's description. Kelsey relayed to Millisor that Bauman was intoxicated from having consumed multiple drinks on the flights to and from Tampa. And when the officers approached Bauman, they smelled alcohol on his breath and noticed that he had glassy eyes. They also observed Bauman having trouble standing or walking straight, and he struggled to produce his identification from his wallet when asked to do so by the officers. When the officers asked Bauman how much he had to drink, he replied: "a couple shots." Bauman also refused one of the officer's request to take a PBT.

Because the officers communicated this information among themselves before placing Bauman under arrest, we are able to look at the entire situation. *See Duval*, 742 F.3d at 253. The cumulation of these undisputed facts was more than sufficient for the officers to reasonably infer that Bauman was intoxicated. An officer can reasonably conclude that a suspect is intoxicated from his "refusal to submit to a field sobriety test, combined with evidence of alcohol consumption." *Kinlin v. Kline*, 749 F.3d 573, 580 (6th Cir. 2014). This court in *Kinlin* held that probable cause existed to arrest the suspect driver for driving under the influence of alcohol where the suspect driver "(1) made a lane change with only two feet of clearance, (2) smelled of alcohol, (3) admitted to consuming alcohol, and (4) thrice refused a field sobriety test." *Id.* For the purposes of being an indicator of intoxication, Bauman's difficulty standing and walking is akin to a driver not following the rules of the road, and Bauman exhibited all of the other indicia of intoxication delineated in *Kinlin*. *See also Cain v. Irvin*, 286 F. App'x 920, 925 (6th Cir. 2008) (finding that the officers had probable cause to arrest the suspect for public intoxication "[b]ased

on plaintiff's admitted use . . . of [prescription medication], her difficulty standing, slurred speech, and non-reactive pupil dilation").

Bauman nevertheless contends that "the admissible evidence demonstrates he was not intoxicated" because he allegedly had only "three drinks in a more than six hour period," and therefore his blood alcohol content could have been "at most .03." But that argument is unavailing because he repeatedly refused to take a PBT that would have estimated his blood alcohol content, and that refusal was itself one indicator of drunkenness. *See Kinlin*, 749 F.3d at 580. Moreover, "our inquiry is not to determine the veracity of the charge, i.e., [whether Bauman was] *actually* intoxicated, but rather whether [the officers] had probable cause *to believe* that [Bauman] was intoxicated." *Cain*, 286 F. App'x at 925 (emphasis in original).

Bauman also argues that the video evidence directly contradicts the officers' testimony that he was staggering. "When videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted' by the videotape; rather[,] it should view the facts in the light depicted by the videotape." *Cunningham v. Shelby County*, 994 F.3d 761, 763 (6th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Here, both sides oversell what the video evidence demonstrates because the footage captures only quick glimpses of Bauman up-close. What is shown, however, does not blatantly contradict the version of events laid out by the officers' testimony. Bauman is seen walking unevenly at a very slow pace several steps behind his children, repeatedly correcting his trajectory—behavior that is consistent with the officers' description. Although he does not appear to be on the verge of falling over in any of the videos, that does not blatantly contradict the officers' testimony that he was "unsteady" and "staggering." The video evidence is ultimately as consistent with a drowsy person as one who is intoxicated, but that does nothing to prevent us from relying on the officers' testimony that several

factors—not just the unsteady walking—reasonably led them to conclude that Bauman was intoxicated.

The second element of a disorderly-conduct charge is that the person is "either endangering directly the safety of another person or is acting in a manner that causes a public disturbance." Mich. Comp. Laws § 750.167(e). Here, the evidence supports a reasonable inference that Bauman's intoxication endangered the safety of his children. The officers were told on the dispatch call that Kelsey was crying and did not want to get in the car with her father. Upon arriving at the scene, the officers encountered Kelsey crying and hiding behind the information desk. They then determined, based on all that they observed, that Bauman was intoxicated. At that point, they could reasonably conclude that Bauman posed a threat to Kelsey's safety and that the danger was imminent because Bauman and the children had already gathered their luggage.

Bauman, moreover, was apparently aware that he was unfit to drive due to his intoxication, which is why he intended for Kelsey to drive because she had a Florida learner's permit. Florida law requires individuals with a learner's permit to drive under the supervision of a licensed driver in the car. Fla. Stat. § 322.1615(2). Allowing a teenage driver with a learner's permit—who was in a distressed emotional state—to drive a car while being supervised by an intoxicated parent would have endangered the safety of everyone in the car. Although Zahina testified that Bauman was not arrested for indicating that his daughter would drive the group home, that does not prevent us from considering this fact in the probable-cause analysis. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (explaining that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

In sum, the totality of the circumstances allowed officers Berti, Millisor, and Zahina to reasonably conclude that Bauman was intoxicated in a public place and was endangering the safety

of his children.  These officers therefore had probable cause to arrest Bauman for disorderly conduct, meaning that summary judgment was properly granted in their favor.

### 2. *Tavtigian*

We now turn to Bauman's contention that Tavtigian wrongfully detained him overnight in the police station without probable cause.  Tavtigian testified that Bauman appeared intoxicated and that he did not know how much alcohol was in Bauman's system.  Custodial officers, Tavtigian explained, "were told to hold someone for twenty-four hours to make sure there's no alcohol in the system."  This policy is required by Michigan law, which states, in the context of an arrest without a warrant:

> If, in the opinion of the arresting officer or department, the arrested person is under the influence of intoxicating liquor or a controlled substance, or a combination of intoxicating liquor and a controlled substance, . . . or it is otherwise unsafe to release him or her, the arrested person shall be held . . . until he or she is in a proper condition to be released . . . .

Mich. Comp. Laws § 780.581(3).

Bauman argues that the video evidence belies Tavtigian's determination that Bauman was intoxicated at the police station and unable to stand, and therefore contends that Tavtigian should have released him.  But the video does not negate the fact that Tavtigian was informed by his fellow officers that Bauman was intoxicated, and Tavtigian himself smelled alcohol on Bauman's person at the police station.  Bauman also repeatedly refused to take a PBT while detained. Tavtigian therefore had a reasonable basis to believe that Bauman was still intoxicated.  Detaining Bauman overnight to ensure that he would be sober when released was thus in compliance with Mich. Comp. Laws § 780.581(3) and not a violation of the Fourth Amendment.

## III.  CONCLUSION

We conclude that Bauman has failed to raise a genuine dispute of material fact as to whether he was unlawfully detained without probable cause.  We therefore **AFFIRM** the district court's grant of summary judgment in favor of the four officers.