NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0235n.06

No. 22-1362

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

May 24, 2023
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| LOGAN DAVIS, | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR |
| | ) THE EASTERN DISTRICT OF |
| JEREMY WALLEMAN; CITY OF | ) MICHIGAN |
| STERLING HEIGHTS, MICHIGAN, | ) |
| Defendants-Appellants. | ) OPINION |
| | ) |

Before: BOGGS, STRANCH, and THAPAR, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** In 2019, Officer Jeremy Walleman arrested 18-year-old Logan Davis while he was waiting under an awning in the rain for his father to pick him up from work. Davis sued Walleman and the City of Sterling Heights, alleging violations of his First, Fourth, and Fourteenth Amendment rights, and parallel state law claims. Defendants moved for summary judgment, claiming that Walleman was entitled to qualified immunity as to Davis's constitutional claims and governmental immunity as to his Michigan law claims. The district court denied the motion, concluding that genuine disputes of material fact existed and that Walleman was not entitled to immunity. Walleman appealed. For the reasons that follow, we **DISMISS** his appeal for lack of jurisdiction.

## I. BACKGROUND

The following facts were found by the district court. On April 25, 2019, Logan Davis had just finished his after-school shift at Firehouse Subs at a shopping center in Sterling Heights,

Michigan. Davis, who is Black, usually worked the closing shift until 9 p.m. He then typically spent about 20 minutes cleaning and closing up the store with his coworker but, that day, it took a little longer to finish, so Davis left work at around 9:40 or 9:45 p.m. As he often did, Davis walked to the front of the building to wait for his father to pick him up. One flood light remained on inside Firehouse Subs, illuminating part of the business's interior. All the businesses in the shopping center were closed.

It was dark and raining, so Davis waited for his father to arrive under the awning of Dickey's Barbecue, two doors down from Firehouse Subs. Davis thought the Dickey's Barbecue awning was lower and stretched out further from the business's entrance, so it would provide more rain cover. Besides a neon light in the window, there were no lights on inside Dickey's, but Davis believed that it would be easier for his father to see him in front of the "bright" neon light. Davis called his father to pick him up and stood under the Dickey's awning, listening to music and wearing his work uniform, a t-shirt with the Firehouse Subs logo on it, under a hoodie.

While on patrol that evening, at approximately 9:47 p.m., Officer Jeremy Walleman saw a person standing in front of Dickey's. It was dark and raining, and Walleman could not identify the person's race or sex from the road. Because all the businesses in the shopping center were closed, there were no cars in the parking lot, and Walleman was aware of prior commercial break-ins in the area (including a single attempted break-in at a business in the shopping center three years before), he decided to investigate. "[T]o [his] knowledge," the Dickey's and Firehouse Subs awnings were identical.

Walleman pulled up to Dickey's and asked Davis what he was doing and if he worked "here or something." Davis said he worked at Firehouse Subs and was waiting for his father, and

he began recording the encounter. Walleman asked for his name, and Davis gave his first name but not his last. Walleman then asked for identification.

A brief argument ensued. Walleman said that a city ordinance required Davis to provide identification, and that he had a "lawful reason" to stop Davis because he was "loitering." Davis answered, "How am I loitering if I just got off, waiting on my dad?" In response, Walleman asked, "How am I supposed to verify that, brother?" Dashcam video then appears to show Davis unzipping his hoodie and showing Walleman his work shirt. Davis later testified that he also showed Walleman his work badge; Walleman disputes this. Walleman later testified that he could not see Davis's shirt because he was standing in a "darkened area" and wearing a zip-up jacket over it.

Within 30 seconds of this exchange, Walleman ordered Davis to turn around and put his hands behind his back, then tackled him to the ground, pinning him on his right side and pushing his head into the pavement. Davis was handcuffed and put in a patrol car. Describing the events leading to Davis's arrest to other police officers, Walleman told one officer that Davis "was showing [him] his shirt" during the encounter, but when the officer asked where Davis worked, Walleman responded, "Firehouse, but I don't know that, all these businesses are closed." Minutes later, Walleman emphasized again to a different officer that he did not know whether Davis actually worked at Firehouse Subs. The other officer asked whether Walleman had asked for identification, "like 'hey, show me your shirt,' or nothing." This time, Walleman responded, "Mm-mm, nope, wouldn't even show me his ID."

Davis was ultimately arrested, and the charges against him—loitering and resisting and obstructing an officer—were later dismissed. He sued Walleman and the City of Sterling Heights claiming First Amendment retaliation and violations of his Fourth and Fourteenth Amendment

rights to be free from wrongful investigation, imprisonment, arrest, excessive force, and malicious prosecution, and associated state law claims. Defendants moved for summary judgment, claiming that Walleman was entitled to qualified and governmental immunity. Davis opposed the motion but dismissed his claims against Sterling Heights.

Taking the facts in the light most favorable to Davis, the district court concluded that it was unclear whether reasonable suspicion existed when Walleman stopped Davis. And if it did exist, a reasonable jury could find that Davis's response, explaining his presence and showing his uniform and badge, was enough to dispel "any even arguable suspicion of loitering" under the local anti-loitering ordinance, "or of any other criminal activity." The court accordingly denied summary judgment as to Davis's Fourth and Fourteenth Amendment claim of wrongful investigation, arrest, and imprisonment.

For similar reasons, the court held that Davis's First Amendment retaliation claim could proceed. Because a reasonable jury could conclude that Davis was arrested without probable cause, and because the encounter escalated very quickly after Davis questioned Walleman's authority to request his identification, a reasonable jury could also conclude that the arrest was motivated, at least in part, by a desire to retaliate against Davis's criticism. Qualified immunity would turn on the "factual question" of whether or not Walleman had retaliation as a motive.

## II.  ANALYSIS

### A.  Jurisdiction and Standard of Review

A district court's denial of qualified immunity is appealable under the collateral order doctrine. *See Rafferty v. Trumbull County*, 915 F.3d 1087, 1092 (6th Cir. 2019) (citation omitted). But "circuit courts can review a denial of qualified immunity only 'to the extent that it turns on an issue of law'—the appeal cannot be from a district court's determination that there is a genuine

dispute of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). Nor may a defendant "challenge the inferences the district court draws from those facts." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). Accordingly, when challenging the denial of summary judgment based on qualified immunity grounds, "a defendant . . . must 'concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Rafferty*, 915 F.3d at 1092 (quoting *Baker v. Union Township*, 587 F. App'x 229, 232 (6th Cir. 2014)).

We review de novo a district court's denial of summary judgment based on qualified immunity. *Chapman*, 814 F.3d at 444. Where, as here, the record contains "a videotape capturing the events in question," we cannot adopt a version of the facts that is "blatantly contradicted" by the video footage. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007). "But we must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

### B.    Davis's Fourth and First Amendment Claims

For Davis to show that his Fourth Amendment rights were violated, he must show that Walleman lacked probable cause to arrest him for either loitering or refusing to produce identification. Because it would be illegal to refuse to provide identification only during a valid *Terry* stop, *see Barrera v. City of Mt. Pleasant*, 12 F.4th 617, 622 (6th Cir. 2021), Davis must show that reasonable suspicion to stop and detain him either did not exist or did exist but was dispelled pre-arrest.

Walleman couches his appeal as purely legal, not factual—*i.e.*, challenging the "*legal* determination that the defendant's actions violated a constitutional right or that the right was

clearly established," and "a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence." *DiLuzio*, 796 F.3d at 609. But factual disputes lie at the heart of this appeal, which depends on determining whether reasonable suspicion existed at the outset of the encounter.

We cannot make that determination, because Walleman's arguments impermissibly rely "on [his] own version of the disputed facts and the inferences [he] would draw from them." *Id.* at 611. For instance, he claims multiple times that Davis was a "shadowy figure" "lingering" in front of Dickey's at "approximately 10:00 p.m." Walleman not only suggests that Davis was in the shopping center later than Davis says he was, but also describes Davis's presence as "lingering," thus implying that he was somehow "slow in parting or in quitting," which Walleman had no way of determining at the "outset" of the encounter. *See Lingering*, Merriam-Webster Dictionary (online ed. 2023), https://www.merriam-webster.com/dictionary/linger (last accessed May 23, 2023). Walleman also claims it is "indisputable, based on the dash-cam video, that any person coming to pick Davis up would have had an easier time seeing him if he was in front of the lit Firehouse Subs, instead of the dark Dickey's Barbeque." The district court did not find or infer such. *See Bunkley v. City of Detroit*, 902 F.3d 552, 561 (6th Cir. 2018) (noting that appellate courts may not make findings of fact or inferences). Also contrary to Walleman's assertion, the dash cam footage's resolution and positioning are such that it is impossible to conclude that the Dickey's and Firehouse Subs awnings were "identical," which also undermines his assertion of reasonable suspicion. And he ignores altogether the district court's finding that there was a genuine issue of material fact as to whether he saw Davis's uniform and badge.

Given all these disputes, we cannot review the district court's holding as to reasonable suspicion. And without reasonable suspicion, Walleman could not have had probable cause to arrest Davis, either for loitering or for refusing to identify himself.[1] *See Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (citation omitted)). Walleman's arguments as to reasonable suspicion and probable cause are thus grounded in disputes of material facts and are unreviewable at this stage.

So is Walleman's claim that he did not retaliate against Davis. A First Amendment retaliatory arrest claim requires the plaintiff to "prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). Because there is no constitutional right to refuse to identify oneself during a lawful *Terry* stop, *see Barrera*, 12 F.4th at 622, Walleman posits that if there was probable cause or arguable probable cause to arrest Davis when he refused to identify himself during a lawful *Terry* stop, Walleman is entitled to qualified immunity from Davis's First Amendment claim. This logic relies on the existence of probable cause at the time of Davis's arrest, which, in turn, relies on the existence of reasonable suspicion, which—again—relies on the resolution of disputed facts critical to addressing the claims in this case. Such factual disputes deprive us of jurisdiction.

---

[1] Section 35-19 of the Sterling Heights Code of Ordinances makes it a misdemeanor for a person "by physical, verbal or passive action or inaction" to "[w]illfully fail or refuse to provide identification to an officer who is investigating possible unlawful conduct." *See also* Mich. Comp. L. § 750.479; *Barrera*, 12 F.4th at 623 (police officers are entitled to qualified immunity under Michigan's obstruction statute when they arrest persons who refuse to identify themselves during a lawful *Terry* stop).

## III.  CONCLUSION

Walleman's appeal is premised on material factual disputes fundamental to his qualified immunity claim.  *See Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020) (dismissing qualified immunity appeal for lack of jurisdiction where disputed factual issues were crucial to the appeal).  We therefore **DISMISS** Walleman's appeal for lack of jurisdiction.