RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

                        *Plaintiff-Appellee*,

    *v.*

HERBERT MARSH,

                        *Defendant-Appellant.*

No. 22-5746

———————

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:18-cr-00192-3—William Lynn Campbell Jr., District Judge.

Argued: January 24, 2024

Decided and Filed: March 12, 2024

Before: McKEAGUE, LARSEN, and MURPHY, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Lauren E. Ross, MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Appellant. Rascoe Dean, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Lauren E. Ross, MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Appellant. Rascoe Dean, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

      LARSEN, J., delivered the opinion of the court in which McKEAGUE and MURPHY, JJ., joined. MURPHY, J. (pp. 13–15), delivered a separate concurring opinion.

———————

## OPINION

———————

      LARSEN, Circuit Judge. Herbert Marsh and two others robbed a Nashville pawn shop at gunpoint, stealing eleven firearms and more than $8,000 in cash. They were subsequently

charged with Hobbs Act robbery and several firearms offenses. Marsh's co-conspirators pleaded guilty, but Marsh did not. After the district court denied his motion to suppress, Marsh proceeded to trial and was convicted by a jury on six of the seven charges against him. On appeal, Marsh challenges the denial of his suppression motion and contends that the district court imposed a procedurally unreasonable sentence. For the following reasons, we AFFIRM.

I.

On the morning of June 26, 2018, Herbert Marsh, Hakeem Mannie, and James Horton pulled up to Music City Pawn #3 in Nashville, Tennessee. They wore masks and gloves, and Horton was armed with a black pistol with an extended magazine. As the men entered the store, Horton pointed his gun at the two employees and ordered them to the ground. Marsh carried one of the employees by his belt buckle to the back of the store and ordered him to open the safe. Mannie emptied the cash registers at the front of the store. The three robbers ultimately stole eleven firearms and more than $8,000 in cash.

The next day, Marsh, Mannie, Horton, and a fourth person were riding in Marsh's car when they caught the attention of two Nashville police officers. The officers thought that Marsh's gray BMW sedan resembled the vehicle description in a "be on the lookout" report they had received, so they began to follow the car, waiting for it to commit a traffic violation. After a few minutes, Marsh's car arrived at a red light at the intersection of 24th Avenue North and Rosa Parks Boulevard. When the light turned green, the car turned left into the outside right lane of Rosa Parks Boulevard, which has two lanes of traffic traveling in each direction. The officers believed that Tenn. Code Ann. § 55-8-140(2) required drivers turning left to enter the lane closest to the center of the road (*i.e.*, the leftmost lane), so they initiated a traffic stop of Marsh's vehicle. While speaking with the driver, Horton, the officers determined that they had probable cause to search the vehicle for drugs. The search turned up marijuana and five firearms—three in a backpack in the trunk, and two in the locked glovebox. Of the five firearms, four were identified as stolen in the previous day's robbery of Music City Pawn, and the fifth was identified as stolen in an unrelated incident. The latter firearm, a Springfield XD .45 caliber, was the gun brandished by Horton during the robbery. The officers arrested Marsh, Mannie, and Horton.

A federal grand jury subsequently charged Marsh with seven offenses: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Two); the use, carry, and brandishing of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Count Three); theft of firearms from a federal firearm licensee's business inventory in violation of 18 U.S.C. §§ 922(u), 924, and 2 (Count Four); possession of a stolen firearm in violation of 18 U.S.C. §§ 922(j), 924, and 2 (Count Five); possession of a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count Six); and attempted witness tampering in violation of 18 U.S.C. § 1512(b)(1) (Count Seven).

Marsh moved to suppress the evidence obtained from the search of his car on the ground that the traffic stop was unlawful.  At the suppression hearing, Marsh argued that Horton "didn't violate the law in making th[e] [left] turn," so the officers lacked probable cause for the stop.  R. 178, Suppression Tr., PageID 654–55.

The district court denied the suppression motion.  The court noted that the parties "appear[ed]" to "ultimately agree" that, contrary to the officers' belief, a driver is not required under Tenn. Code Ann. § 55-8-140(2) to turn left into the inside lane under the circumstances of this case.  R. 175, Order, PageID 511.  But it observed that "[a]n officer's reasonable, but mistaken belief that the conduct in question is illegal, is sufficient probable cause for a [traffic] stop."  *Id.* at 510.  Because the court determined that the traffic law "le[ft] some room for interpretation," it concluded that the stop was "based on an objectively reasonable belief that a traffic violation had occurred" and so did not violate the Fourth Amendment.  *Id.* at 510–11.

The case went to trial, and the jury found Marsh guilty of all charges except for Count Three, which accused him of using, carrying, and brandishing a firearm during and in relation to a crime of violence.

The Probation Office's Presentence Investigation Report (PSR) grouped all of the counts of conviction pursuant to U.S.S.G. § 3D1.2.  And the PSR identified a base offense level of 20 because Marsh was a convicted felon and the offense involved a semiautomatic firearm that was capable of accepting a large capacity magazine (the Springfield XD).  *See* U.S.S.G.

§ 2K2.1(a)(4)(B); 18 U.S.C. § 922(g)(1).  As relevant here, the PSR proposed three enhancements, which increased his offense level by 10: (1) a § 2K2.1(b)(1)(B) enhancement because the offense involved between eight and twenty-four firearms; (2) a § 2K2.1(b)(4)(A) enhancement because the offense involved stolen firearms; and (3) a § 2K2.1(b)(6)(B) enhancement because the defendant used or possessed a firearm in connection with another felony offense.  With Marsh's criminal history category of VI, the PSR identified a Sentencing Guidelines range of 210 to 262 months of imprisonment.

Marsh objected, arguing that these enhancements impermissibly double counted conduct and improperly relied on acquitted conduct.  The district court disagreed and sentenced Marsh to 210 months of imprisonment.

II.

Marsh challenges the district court's denial of his motion to suppress, and he argues that its calculation of his sentence was procedurally unreasonable.  We consider each issue in turn.

A.

The Fourth Amendment protects against unreasonable traffic stops by law enforcement officers.  *Delaware v. Prouse*, 440 U.S. 648, 653–55 (1979).  In *Heien v. North Carolina*, the Supreme Court held that an officer who executes a traffic stop based upon an objectively reasonable mistake of law does not violate the Fourth Amendment.  574 U.S. 54, 60–61 (2014).  "'To be reasonable is not to be perfect,' the Court explained, 'and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection.'"  *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 621 (6th Cir. 2021) (internal quotation marks omitted) (quoting *Heien*, 574 U.S. at 60–61).  That said, the standard of objective reasonableness in this context "is not as forgiving as the [standard] employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation."  *Heien*, 574 U.S. at 67.  So "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce."  *Id*.  In the absence of clarifying guidance from state courts, however, an officer is not expected to interpret a statute with the precision that a court would.  *See United States v.*

*Stevenson*, 43 F.4th 641, 646–47 (6th Cir. 2022). In *Heien*, for instance, the Court determined that an officer's mistaken understanding of North Carolina's rear-brake-light law was objectively reasonable because the officer's reading was "arguably" correct, and no state appellate court had previously construed it. 574 U.S. at 68.

We review the denial of a suppression motion de novo as to legal conclusions and for clear error as to findings of fact. *United States v. May-Shaw*, 955 F.3d 563, 566 (6th Cir. 2020). The facts at issue here are not disputed. Horton was driving Marsh's car when he turned left from 24th Avenue North into the outside right lane of Rosa Parks Boulevard. Police officers initiated a traffic stop on the belief that a left turn into the outside right lane violated Tenn. Code Ann. § 55-8-140(2). Marsh argues, and the government does not dispute, that the officers were mistaken in their understanding of the law. And the government does not claim that the turn was otherwise unsafe or illegal. So the question presented is simply whether the officers' interpretation of § 55-8-140(2) was objectively reasonable. That statute provides:

> At any intersection where traffic is permitted to move in both directions on each roadway entering the intersection, an approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and by passing to the right of the center line where it enters the intersection, and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered. Whenever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection[.]

Tenn. Code Ann. § 55-8-140(2).

To determine whether the officers' understanding of this statute was reasonable, "[w]e begin our inquiry with [Tennessee] caselaw." *Stevenson*, 43 F.4th at 646; *see also Barrera*, 12 F.4th at 621 ("Favorable case law goes a long way to showing that an interpretation is reasonable."). Only one Tennessee case has endeavored to interpret § 55-8-140(2). In *Wright v. City of Knoxville*, a police officer responding to a call was traveling eastbound toward a high-traffic intersection; to get around traffic stopped at the red light, the officer moved into the left (westbound) side of the road and slowly approached the intersection. 898 S.W.2d 177, 178 (Tenn. 1995). Brian Anderson, meanwhile, sat in the left turn lane on the north-south roadway, preparing to turn left into the westbound lanes. *Id.* When a green arrow appeared, he began the

left turn, unable to see the police vehicle heading eastbound.  *Id.*  As the police vehicle passed the lead car in the eastbound turn lane, Anderson and the officer collided.  *Id.*

In considering the apportionment of fault for this collision, the Supreme Court of Tennessee stated that Anderson had failed to comply with his statutory duty under § 55-8-140(2) because, instead of executing a ninety-degree turn "as mandated by the statute," Anderson's "turn was actually closer" to forty-five degrees.  *Id.* at 180.  And observing that the statute was "hardly a model of clarity," the court nonetheless concluded that it was "obvious that the statute imposes upon motorists the duty to execute left turns as close to the center lines of the respective roadways as possible in order to maximize visibility."  *Id.* at 181.

The government argues that this last sentence from *Wright* supports the officers' belief that a driver must turn left into the inside lane—that is, the lane "close[st] to the center line[]." *Id.*  But Marsh contends that *Wright* has no bearing on the issue in this case because it speaks only to a driver's conduct *within* an intersection, not to the manner in which a driver must *exit* an intersection.  And on that latter point, he submits, the plain text of § 55-8-140(2) imposes no restrictions on the lane that a driver may use.  Marsh finds support for his position from the Tennessee Attorney General, whose views on Tennessee law are persuasive, though not controlling.  *See Brown v. Knox County*, 39 S.W.3d 585, 589 (Tenn. Ct. App. 2000).  The Attorney General has opined—albeit without discussion of *Wright*—that Tennessee law "does not specify the lane into which a left-turning driver is required to enter."  Tenn. Op. Att'y Gen. No. 15-32, 2015 WL 1754608, at *1, *3 (Apr. 8, 2015).

For purposes of this appeal, we need not take a definitive view on the meaning of *Wright* or of § 55-8-140(2), let alone on the merits of the Tennessee Attorney General's opinion.  Our question is merely whether the officers' understanding of the law was "objectively reasonable." It is enough that *Wright* at least strongly suggests that § 55-8-140(2) mandates the use of the inner lane after making a left turn.  In fact, it is difficult to understand what else it could mean to turn "as close to the center line[] . . . as possible."  *Wright*, 898 S.W.2d at 181.  We cannot say that it was objectively unreasonable for the officers to read the statute in a way that seemingly accords with the interpretation of the Supreme Court of Tennessee.  *Cf. United States v. Henry*,

853 F.3d 754, 757–58 (5th Cir. 2017) (holding that officers' interpretation was objectively reasonable because it was consistent with a state appellate court's analysis).

Marsh's textual arguments, moreover, lose much force in the face of *Wright*'s highly suggestive language favoring the officers' understanding of the law. And the text of § 55-8-140(2) is not so clear as to undermine their view. *Cf. Stevenson*, 43 F.4th at 647 (considering, in the absence of state caselaw on point, whether "statutory context . . . undermine[d]" the officer's reading of an ambiguous provision); *Barrera*, 12 F.4th at 624 ("[W]e need not resolve each mete and bound of [the] statute . . . . We need only decide whether the officers' interpretation sinks to unreasonable."). As the Supreme Court of Tennessee itself observed, the statute is "hardly a model of clarity." *Wright*, 898 S.W.2d at 181. The final sentence of the provision, in particular, leaves some room for interpretation. That sentence states that, "[w]henever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection." Tenn. Code Ann. § 55-8-140(2). It is plausible to read this as requiring a driver to continue from the left of the center of the intersection to the left of the center of the lawfully available lanes on the new roadway. Indeed, several state courts around the country have interpreted identical statutory language to have such a meaning. *E.g.*, *State v. Graham*, 17 N.E.3d 112, 116 (Ohio Ct. App. 2014); *State v. Steen*, 102 P.3d 1251, 1253–54 (Mont. 2004). True, other courts have taken Marsh's view of the meaning of similar or identical statutes. *E.g.*, *Gunn v. State*, 956 N.E.2d 136, 139–40 (Ind. Ct. App. 2011), *abrogated on other grounds as recognized in Mercado v. State*, 200 N.E.3d 463 (Ind. Ct. App. 2022); *State v. Almeida*, 253 P.3d 941, 943–44 (N.M. Ct. App. 2011); *State v. Petty*, 134 N.E.3d 222, 228–30 (Ohio Ct. App. 2019). But the presence of these disagreements, coupled with the arguable import of *Wright*, leaves us hard-pressed to conclude that the officers' understanding of § 55-8-140(2) was unreasonable. *See United States v. McCullough*, 851 F.3d 1194, 1201 (11th Cir. 2017) (deeming an officer's mistake reasonable where the text of the law "le[ft] open the possibility" of the officer's interpretation); *cf. Heien*, 574 U.S. at 70 (Kagan, J., concurring) (suggesting that an officer's reading is not unreasonable when "a reasonable judge could agree with the officer's view" (citation omitted)).

The officers' mistake of law was objectively reasonable, so the traffic stop of Marsh's vehicle did not violate the Fourth Amendment. The district court therefore properly denied Marsh's motion to suppress.

B.

Marsh next argues that the district court's calculation of his Sentencing Guidelines range was procedurally unreasonable, for two reasons. First, he contends that the court's explanation for a factual finding underlying its calculations was unjustified. Second, he believes that the court engaged in impermissible double counting.[1] We ordinarily review challenges to the procedural reasonableness of a sentence for abuse of discretion. *United States v. Nunley*, 29 F.4th 824, 830 (6th Cir. 2022). An unpreserved procedural-reasonableness challenge, however, is reviewed only for plain error. *Id.*

1.

At sentencing, Marsh contended that the PSR's offense-level calculations relied on impermissible double counting. Specifically, he argued that the same activity—Horton's brandishing of the Springfield XD during the June 26 robbery—was driving his offense level in two ways: through the selection of the U.S.S.G. § 2K2.1(a)(4)(B) base offense level (for an offense involving a "semiautomatic firearm that is capable of accepting a large capacity magazine") and through the application of the U.S.S.G. § 2K2.1(b)(6)(B) enhancement (for possession of a firearm "in connection with another felony offense"). Although it did not say so expressly, the district court seemed to accept Marsh's view that this would present a double-counting problem. So to avoid any problem, the district court explained that it would rely on the jury's finding that Marsh possessed the Springfield XD on June 27, the day of the traffic stop, for the base offense level. Under this approach, Marsh's possession offense—extending into June 27—involved a semiautomatic firearm capable of accepting a large capacity magazine, triggering the § 2K2.1(a)(4)(B) base offense level. That conduct, however, was distinct from Horton's

---

[1]Marsh also argues that the district court improperly relied on acquitted conduct in calculating his sentence. As Marsh acknowledges, however, this challenge is squarely foreclosed by precedent. *See, e.g.*, *United States v. Reed*, 72 F.4th 174, 189 (6th Cir. 2023) (quoting *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc)). We therefore do not address it.

possession of the same firearm the previous day "in connection with another felony offense" (the robbery of the pawn shop), which in turn justified the § 2K2.1(b)(6)(B) enhancement.

As both parties agree, Marsh did not object to this maneuver by the district court, even after the court asked the *Bostic* question. *See United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004). Accordingly, we review his challenge for plain error. *Nunley*, 29 F.4th at 830; *see Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016); Fed. R. Crim. P. 52(b). On plain-error review, relief is warranted only if there was (a) an error that (b) was obvious or clear, (c) affected Marsh's substantial rights, and (d) affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). This standard is satisfied "[o]nly in exceptional circumstances." *Id.* (citation omitted).

Marsh argues that it was error for the district court to conclude, based solely on the guilty verdict, that the jury found that he possessed the Springfield XD on June 27. The court believed that the jury's verdict on the felon-in-possession charge necessarily implied that the jury found that Marsh possessed the Springfield XD on June 27. But, in Marsh's view, the guilty verdict did not logically entail such a finding. Count Six of the indictment alleged that "[b]etween on or about June 26, 2018 and June 27, 2018," Marsh knowingly possessed a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924, and, using a "to wit" clause, it identified five firearms, including the Springfield XD. R. 166, Second Superseding Indictment, PageID 484. The rule is well-established that "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). And in *United States v. DeJohn*, we held that the "particular firearm possessed is not an element of the crime under § 922(g), but instead the means used to satisfy the element of 'any firearm.'" 368 F.3d 533, 542 (6th Cir. 2004). So, as Marsh argues, the jury could have returned a guilty verdict on this count without a unanimous finding that he possessed a *specific* firearm (or specific firearm*s*) among the five charged in the indictment. It follows, Marsh continues, that the jury's verdict on its own was not enough to support the court's factual finding that Marsh possessed the Springfield XD on June 27.

We need not decide whether the district court erred, because any error did not lead to a miscalculated Guidelines range. So Marsh cannot show an effect on his substantial rights. The district court's discussion of Marsh's purported June 27 possession of the Springfield XD was an unnecessary detour intended to avoid what the court perceived as a double-counting problem. However, even if we treat as unsubstantiated the finding of possession on June 27, the court's factual findings fully support its Guidelines calculations without any double counting.

The PSR's proposed base offense level under § 2K2.1(a)(4)(B) was tied to Marsh's convictions for stealing firearms, possessing stolen firearms, and being a felon in possession. *See* U.S.S.G. App'x A (Statutory Index); 18 U.S.C. § 922(u), (j), (g)(1). That base offense level applied to Marsh because of a specific type of firearm (a "semiautomatic firearm that is capable of accepting a large capacity magazine") "involved" in his offense and his status as a convicted felon. U.S.S.G. § 2K2.1(a)(4)(B). The PSR also relied on an enhancement that applies to a defendant who "used or possessed any firearm . . . in connection with another felony offense." *Id.* § 2K2.1(b)(6)(B). The PSR based this enhancement on Horton's brandishing of the Springfield XD during the June 26 robbery. *See id.* § 2K2.1 cmt. 14(A) (explaining that subsection (b)(6)(B) applies "if the firearm . . . facilitated, or had the potential of facilitating, another felony offense").

At the sentencing hearing, prior to turning its attention to Marsh's purported June 27 possession of the Springfield XD, the district court first rejected Marsh's argument that it should not apply the subsection (b)(6)(B) enhancement because the enhancement rested on acquitted conduct. Although Horton (not Marsh) brandished this firearm, the court reasoned that the use of the firearm constituted jointly undertaken criminal activity within the meaning of § 1B1.3(a)(1)(B). In other words, Horton's actions qualified as "relevant conduct" for Marsh's crime too. *See id.* § 2K2.1 cmt. 14(E) ("[T]he court must consider the relationship between the instant offense and the other offense, consistent with relevant conduct principles."). Notably, moreover, the same relevant-conduct principles apply when determining Marsh's base offense level. *See id.* § 1B1.3(a) (instructing courts to determine the base offense level with reference to relevant-conduct principles). Horton's June 26 brandishing of the Springfield XD, then, supports both the base offense level and the enhancement.

And no double counting results from these calculations.  Double counting occurs when a defendant is penalized twice in his sentencing calculation for the same aspect of his conduct—for instance, when the same aspect of the conduct that determines the base offense level also serves as the basis for an enhancement, *see United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010), or when the court applies two separate enhancements for the same aspect of the conduct, *see United States v. Duke*, 870 F.3d 397, 405 (6th Cir. 2017).  Here, though, the calculations are tied to different aspects of Horton's conduct.  The base offense level of § 2K2.1(a)(4)(B) captures the special dangers of firearms offenses in which a particularly dangerous type of firearm is at issue.  The § 2K2.1(b)(6)(B) enhancement penalizes the introduction of firearms into *another* felony offense (here, robbery) but without regard to the type of firearm used.  In other words, whereas the base offense level focuses on the fact that a specific *type* of firearm was involved in Marsh's offense, the enhancement is concerned with how a firearm was *used*—to "facilitate[]" an additional crime.  U.S.S.G. § 2K2.1 cmt. 14(A).  The characteristics of the firearm and the use to which the firearm was put constitute "distinct harms."  *Duke*, 870 F.3d at 405 (citation omitted) (explaining that application of separate enhancements for bodily harm to a victim and bodily injury to a federal employee did not constitute double counting even where the harm was to the same person); *see also United States v. Sweet*, 776 F.3d 447, 451 (6th Cir. 2015) (characterizing the transfer of firearms to a particular person and the purpose for which the transfer was made as distinct aspects of the same conduct).

In sum, even if the district court's reasoning in support of the base-offense-level calculation was flawed, that reasoning amounted to no more than an unnecessary detour in its analysis.  The court mistakenly believed that it could not apply both the base offense level and the subsection (b)(6)(B) enhancement unless it identified separate instances to which each of those calculations could attach.  But no double counting results from reliance on Horton's conduct for both calculations.  So even without Marsh's possible June 27 possession of the relevant firearm, the district court's factual findings fully support holding Marsh accountable for Horton's June 26 conduct through these two calculations, and the court's ultimately superfluous reasoning did not affect Marsh's Guidelines range.  Marsh therefore cannot establish plain error.  *See Molina-Martinez*, 578 U.S. at 198–201; *United States v. Olano*, 507 U.S. 725, 734 (1993).

2.

Marsh also claims that the district court engaged in impermissible double counting when it applied three firearms enhancements—subsections (b)(1)(B), (b)(4)(A), and (b)(6)(B) of § 2K2.1—on top of his base offense level.  Although Marsh preserved this issue in the district court, this argument also fails.  For the reasons explained above, the base offense level and the § 2K2.1(b)(6)(B) enhancement do not entail double counting.   And the other two enhancements—subsections (b)(1)(B) and (b)(4)(A)—penalized Marsh for the *quantity* of firearms (twelve) involved in the offense and for the involvement of *stolen* firearms, respectively.  These subsections are thus "trigger[ed]" by harms that are "conceptually distinct" both from each other and from the harms underlying the base offense level and the subsection (b)(6)(B) enhancement.  *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007); *cf. United States v. Hitch*, 58 F.4th 262, 264 (6th Cir. 2023) (explaining that stealing a firearm and possessing the same stolen firearm are distinct aspects of a defendant's conduct); *United States v. Jackson*, 594 F. App'x 297, 300–01 (6th Cir. 2015) (concluding that there was no double counting in a calculation based upon subsections (a)(4)(A), (b)(1)(A), and (b)(6)(B) of § 2K2.1).  Marsh's Guidelines range was not the result of double counting.

The district court did not impose a procedurally unreasonable sentence.

* * *

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  The Fourth Amendment prohibits only those police "seizures" that one could describe as "unreasonable."  U.S. Const. amend. IV.  So the police do not violate the Fourth Amendment if they stop a driver based on a *reasonable* mistake about what the traffic laws require.  *See Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014).  Judge Larsen's majority opinion cogently explains why the officers here could reasonably believe that Tennessee's left-turn law barred drivers from turning left into the outside lane of a street with two lanes going in both directions.  *See* Tenn. Code Ann. § 55-8-140(2).  I suspect it will take most readers several passes through this sentence to figure out what it means: "Whenever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection[.]"  *Id.*  And, as the majority explains, a broad judicial debate exists over whether similarly worded laws from across the country prohibit left turns into outside lanes.  Although many courts interpret these laws in the way that Marsh prefers, none have found the competing reading unreasonable.

I must admit, though, that I have found this issue close.  Setting aside precedent, at least one thoughtful jurist has concluded that the plain text of Ohio's version of this left-turn law made a turn into the outside lane "perfectly legal."  *State v. Stadelman*, 2013 WL 6054748, at *4 (Ohio Ct. App. Nov. 15, 2013) (DeWine, J., dissenting).  And the Supreme Court in *Heien* clarified that the reasonable-mistake-of-law defense leaves less room for police errors than the qualified-immunity defense that bars damages claims against officers who do not violate clearly established law.  574 U.S. at 67; *see District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).

Perhaps, then, the government's narrow focus on the merits of this Fourth Amendment question has made this case harder than it should have been.  Marsh did not raise his Fourth Amendment argument in the abstract; he raised it in a motion to *exclude* the stolen firearms as evidence at his criminal trial.  Even if the officers violated the Fourth Amendment by unreasonably interpreting Tennessee law, one might wonder whether exclusion of this evidence

would provide the proper remedy—a "distinct issue." *Davis v. United States*, 564 U.S. 229, 243 (2011).

After all, the Supreme Court's judge-made exclusionary rule has been its "last resort," not its "first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The Court now reserves this suppression remedy for situations where its benefits in deterring police misconduct exceed its costs in freeing wrongdoers. *See United States v. Davis*, 84 F.4th 672, 678 (6th Cir. 2023). And the Court generally finds that the remedy meets this demanding cost-benefit test only if officers acted with sufficient "culpability." *See Herring*, 555 U.S. at 143. The remedy covers police who engage in "deliberate" or "reckless" misconduct—not those who merely commit a "negligent" act. *Id.* at 144−45; *see Utah v. Strieff*, 579 U.S. 232, 241 (2016); *Davis*, 564 U.S. at 238.

The question whether the officers in this case unreasonably—that is, *negligently*—interpreted Tennessee's left-turn law is a difficult one. But a finding that the officers acted negligently generally would not suffice to exclude the evidence that they uncovered. *See Herring*, 555 U.S. at 144. And given the judicial debate on this issue, I doubt anyone could go so far as to call their interpretation a *deliberate* or *reckless* misreading of Tennessee law. *See id.* To put things in perspective, while *Heien* distanced its reasonable-mistake-of-law defense from the Court's qualified-immunity test, 574 U.S. at 67, the Court has long equated the so-called good-faith exception to the exclusionary rule with that officer-friendly test, *see Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (citing *United States v. Leon*, 468 U.S. 897 (1984)). In short, a close case on the merits might look like an easy one on the remedy.

Admittedly, a quick post-*Heien* search has uncovered no cases applying (or rejecting) any sort of good-faith exception to the exclusionary rule for mistakes of law. Before *Heien*, however, then-Judge Gorsuch suggested that exclusion might not be the proper remedy in a case involving New Mexico's version of this same left-turn law. *See United States v. Nicholson*, 721 F.3d 1236, 1256–58 (10th Cir. 2013) (Gorsuch, J., dissenting). And I see no reason why the basic "culpability" framework that the Court has used in its recent exclusionary-rule cases should not extend to an officer's interpretation of the law. *Herring*, 555 U.S. at 142. While the good-faith exception to the exclusionary rule originated with an officer's reliance on a judge's decision

to issue a search warrant, *see Leon*, 468 U.S. at 922, the exception has since expanded beyond that domain. For example, the Court applied the exception when officers conducted a search based on then-existing (but mistaken) appellate precedent. *See Davis*, 564 U.S. at 239–41. The Court applied the exception when officers conducted a search based on an unconstitutional statute. *See Illinois v. Krull*, 480 U.S. 340, 349–50 (1987). And the Court applied the exception when an officer made an arrest based on another police employee's "negligent bookkeeping error" in failing to remove an outdated arrest warrant from a police database. *Herring*, 555 U.S. at 137. Why should we treat a police officer's negligent review of the lawbooks differently from a police employee's negligent maintenance of the warrant books?

That said, the government failed to raise any remedy questions in this case. It argued only that the officers reasonably interpreted Tennessee law and so did not violate the Fourth Amendment. This exclusionary-rule question thus will have to await another case for an answer.